UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2010 OCT 28  AM 11: 15

CLERK

BY _____
DEPUTY CLERK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| v. | ) | Case No. 5:10-cr-12-01 |
| | ) | |
| | ) | |
| CHAD LUSSIER | ) | |
| | ) | |

## OPINION AND ORDER DENYING
## DEFENDANT'S MOTION TO SUPPRESS
(Doc. 30)

This matter came before the court on September 8, 2010 for an evidentiary hearing on Defendant Chad Lussier's motion to suppress. Mr. Lussier is charged with five counts of bank robbery under 18 U.S.C. § 2113(a). As more particularly set forth below, Mr. Lussier seeks suppression of all direct and derivative evidence obtained from law enforcement's January 29, 2010 roadside stop of his vehicle, as well as suppression of various items of evidence law enforcement seized after the stop. The Government opposes the motion.

The parties completed post-hearing briefing on October 1, 2010. At the parties' request, the court has reviewed Government's Exhibit 10, which is an audiotape of a police dispatcher's communications on the date and time in question, and Government's Exhibit 3, which is a cruiser videotape (without audio) of the roadside stop.

The Government is represented by AUSA Timothy Doherty, Jr. Mr. Lussier is represented by Mark Kaplan, Esq.

## Findings of Fact

Based upon the admissible evidence, which includes the affidavits filed by the Government in support of its Opposition, the court makes the following findings of fact.[1]

### A.   The Incident.

On January 29, 2010, at approximately 10:03 a.m., a robbery took place at TD Bank located at 425 Main Street in Enosburg Falls, Vermont (the "Bank"). Blaine Kittell was in the Bank's parking lot when a man emerged from the Bank wearing a black coat, a black mask, and a hood. The man left the scene on foot, travelling down Orchard Street. Mr. Kittell relayed these facts to a police dispatcher and further reported that the man was approximately 5′ 6″ tall and weighed between 135 and 140 pounds. The police dispatcher alerted law enforcement throughout the area of Mr. Kittell's description of the suspect, although each time she did so she neglected to mention Mr. Kittell's report of a hood.

### B.   Law Enforcement's Pre-Incident Investigation.

Prior to January 29, 2010, law enforcement had been investigating a series of bank robberies, all of which occurred in Franklin County, Vermont during the preceding four months. Detective Sergeant Kirk Cooper of the Vermont State Police was the lead investigator. In an effort to identify and apprehend the robber, photographic images from the bank robberies, witness descriptions, and a "body type" of the suspect (male, thin build, height 5′ 6″ - 5′ 9″) were disseminated to federal and state law enforcement agencies.

As part of the investigation, law enforcement had questioned Mr. Lussier on several occasions and his home was the subject of a consensual search. According to Detective Sergeant Cooper, Mr. Lussier was the primary suspect in each of the robberies.

---

[1] The Government's Opposition to Mr. Lussier's Motion (Doc. 37) contains substantially more information regarding the four prior robberies than was introduced into evidence. The court's findings of fact are confined to the evidentiary record.

Thus far, the investigation had yielded a substantial amount of information including the following:

- On or about September 25, 2009, the TD Bank in Richford, Vermont was robbed by an individual who stole approximately $800.00.

- On October 5, 2009, the Chittenden Bank in St. Albans, Vermont was robbed by a male with a ski mask. He stole approximately $5,000.00.

- On October 27, 2009, at approximately 10:36 a.m., the Chittenden Bank in Swanton, Vermont was robbed by a male who was reported to be wearing a brown hooded sweatshirt with a skull emblem. He stole approximately $3,300.00. Prior to this robbery, at approximately 9:30 a.m., a Vermont State Trooper's license plate reader captured license plate ERB 121 approximately thirty-seven minutes away from the crime scene. The license plate matches a vehicle registered to Mr. Lussier's wife. After the robbery, two St. Albans police officers who responded to the crime observed a vehicle bearing Vermont plate ERB 121 traveling past them in the opposite direction. Approximately five weeks later, four bank tellers present during the robbery were shown a photo line-up of six men with their faces covered except for their eyes and upper nose area. Each of the tellers identified the photograph of Mr. Lussier as the robber.

- On November 13, 2009, at approximately 11:06 a.m., the TD Bank in Enosburg Falls, Vermont was robbed by a masked male armed with a knife and wearing a brown hooded sweatshirt with a skull emblem on the front and a yellow ski-type hat. This was the same sweatshirt as was worn by the robber in the October 27, 2009 robbery. The robber placed the $7,000.00 he stole in a white plastic bag, leaving on foot. Witnesses and bank employees described the robber as between 5'8"-5'9" in height and of medium build. Two other witnesses advised law enforcement that, on the morning of the robbery, an older model blue Saturn with a Vermont plate number ending in 121 was parked in their driveway which is on a street approximately 150 yards behind the TD Bank. Both witnesses reported seeing a masked man carrying a white plastic bag (one witness indicated it was possibly a Hannaford's grocery store bag) running out of the woods. The man took off the yellow mask, got into the vehicle, and drove away down Church Street towards Vermont Route 105. One of the witnesses described the man as approximately 5'11" in height and 150 pounds with a crew cut, a blondish mustache, and blond facial hair under his lower lip. This witness was able to identify Mr. Lussier's photograph from

a six photo line-up, stating that the photo of Mr. Lussier was "the only guy that would be close."

- A witness advised law enforcement that, shortly after the November 13, 2009 robbery, Mr. Lussier entered the parking lot of her convenience store at a high rate of speed. While in the store, Mr. Lussier acted in a nervous manner. She further reported that Mr. Lussier had recently been frequently exchanging small denomination bills for larger ones, stating he was obtaining the money from his children's "bank money."

- Cliff Patterson advised that the robber was his brother-in-law, Chad Lussier, who lives with him. Law enforcement confirmed that Mr. Lussier lived with Mr. Patterson. Law enforcement further confirmed that Mr. Lussier had two vehicles registered to either himself or his wife, including a blue 1997 Saturn with a Vermont registration/plate number of ERB 121.

- A Vermont state trooper captured a blue Saturn on his car camera traveling away from Enosburg Falls after the November 13, 2009 robbery. In addition, a license plate reader on a St. Albans police cruiser captured Mr. Lussier's plate number, ERB 121, traveling away from Enosburg Falls approximately twenty minutes after that same robbery.

- Mr. Lussier's operator's license revealed he was 5′6″ in height and weighed 145 pounds.

- A ski mask and loose discarded cash were located near the October 5, 2009 robbery. DNA testing of the mask did not exclude Mr. Lussier as a possible donor.

- Two witnesses reported efforts by Mr. Lussier to sell the blue Saturn.

**C.      The Roadside Stop.**

On January 29, 2010, at approximately 10:07 a.m., Vermont State Troopers John MacCallum and Drew Cota responded to the police dispatcher's radio alert regarding the robbery of the Bank in Enosburg Falls. In a police cruiser with activated cruiser lights, they travelled east on Route 105 towards Enosburg Falls as fast as the slippery road conditions allowed. Route 105 is the primary east-west corridor in Franklin County, and connects directly with Orchard Street, the street on which the police dispatcher reported

4

that Mr. Lussier was last seen. Trooper MacCallum instructed Trooper Cota, who was still in training, to look at the operators of oncoming cars for someone who matched the description given by dispatch.

Approximately one mile from the crime scene, Trooper Cota spotted a white sport utility vehicle with a single male occupant wearing a hooded sweatshirt, dark coat, and baseball cap. The vehicle was pulling to the side of the road, presumably in response to the cruiser's lights. Trooper Cota asked Trooper MacCallum: "Is that guy wearing a black hoodie?" Trooper MacCallum responded that he didn't see him and wasn't sure. Trooper Cota then used the radio to instruct Trooper John Bruzzi, who was following in his cruiser, "to stop the white Jeep. I think he's wearing a black hoodie." Trooper Bruzzi asked if Trooper Cota meant the white Ford Explorer and Trooper Cota confirmed that he did.

Thereafter, Trooper Bruzzi turned around his cruiser and pulled up behind the white vehicle which was parked on the roadside approximately 1.7 miles from the Bank. Trooper Bruzzi radioed the vehicle's license plate number to dispatch and then exited his cruiser and approached the driver's side door. He saw a lone male operator and noticed that he was wearing a sweatshirt, jacket, and baseball cap. Trooper Bruzzi asked for identification which the operator provided. It indicated that the operator was Chad Lussier. Mr. Lussier's hand was shaking as he handed over his license. Trooper Bruzzi knew that Mr. Lussier was the primary suspect in the other bank robberies under investigation and that he had been previously questioned. He asked Mr. Lussier to exit the vehicle so that he could pat him down for weapons as he knew that a knife had been used in several of the robberies. A cruiser videotape depicts Mr. Lussier emerging from his vehicle, wearing a baseball cap and a gray hooded sweatshirt under a dark jacket. Trooper Bruzzi found no weapons during his pat down. He asked Mr. Lussier where he was headed and Mr. Lussier advised that he was going to St. Albans to work and had just left the Pattersons' house.

5

Shortly thereafter, Trooper MacCallum and Trooper Cota arrived at the scene of the stop. Trooper Bruzzi asked Mr. Lussier if the reason for the robberies was that he had a drug problem. Mr. Lussier denied any involvement in the robberies. Trooper Bruzzi then asked Mr. Lussier to verify that he never planned on hurting anyone at the bank and stated that he was sure he did not. Trooper Bruzzi testified that his statement to Mr. Lussier was as follows: "There's a reason for the robberies. You have a drug problem. You didn't want to hurt anyone at the bank during the robberies." In response, Mr. Lussier looked down and appeared as though he was about to cry.

Detective Sergeant Cooper arrived at the scene of the stop. Prior to his arrival, he understood that the suspect was reported to be wearing a black coat and mask, and had left the Bank on foot, running down Orchard Street. Detective Sergeant Cooper saw Mr. Lussier standing with the Troopers. He exited his own vehicle and approached the white Explorer and looked inside. On the passenger's side of the vehicle, he saw a dark colored heavy jacket partially on the floor and partially on the seat with clothing under it which he could not see.

Detective Sergeant Cooper approached Mr. Lussier and instructed him to come back and have a seat in his unmarked cruiser. Mr. Lussier did so and stated that he wanted to talk to a lawyer. Detective Sergeant Cooper advised Mr. Lussier that he was being detained because his clothing matched witness descriptions of the bank robber. Mr. Lussier's vehicle was towed and Trooper Bruzzi drove Mr. Lussier to the state police barracks while law enforcement officers obtained a search warrant. Mr. Lussier was placed in a "conference/interview room" at the barracks, but was not questioned further.

**D.    The Search Warrant Application.**

The search warrant application sought  permission to search a white 2000 Ford Explorer bearing Vermont registration EWM 252 for the following property or objects:

> Cash ($3,529.90), clothing to include Carhart[t] type jacket(s), pants, facial masks and any type of clothing articles capable of covering one's face, gloves and footwear. Also, plastic shopping bag(s) similar to a Hannaford bag[.]

6

The application for the search warrant was supported by a seven-page affidavit authored by Detective Sergeant Edward Meslin. It describes the evidence law enforcement had obtained to date, as set forth herein, adding that the affiant had reviewed still images of the Bank's surveillance video depicting a robber wearing a green Carhartt type canvas jacket and a gray hooded sweatshirt.[2] The affiant further indicated that he had observed Mr. Lussier sitting in the police interview room wearing a Carhartt jacket and gray hooded sweatshirt and that Detective Sergeant Cooper and Trooper Bruzzi had looked inside Mr. Lussier's vehicle while it was parked roadside and saw a dark colored Carhartt type jacket in the passenger's seat as well as a pair of leather work gloves. The affiant stated that the Bank's video showed the robber wearing what appeared to be work gloves. The affidavit also contained facts placing Mr. Lussier in the general vicinity of each of the five robberies.

Officers executed the search warrant on Mr. Lussier's vehicle at approximately 3:00 p.m. They collected a number of items from the vehicle, including a grocery bag containing a large amount of cash. Upon completion of the search at approximately 3:30 p.m., Mr. Lussier was placed under arrest for the bank robbery.

**E.     The Seizure of Mr. Lussier's Clothing.**

Law enforcement seized the clothing Mr. Lussier was wearing at the time of his arrest after Mr. Lussier's wife brought replacement clothing. They did so without first obtaining a warrant even though Mr. Lussier's attorney advised the officers that he did not want Mr. Lussier to hand over clothing without a warrant. No evidence was provided

---

[2] In their reports of the January 29, 2010 incident, Troopers Bruzzi and Trooper Cota and Detective Sergeant Cooper each stated that the dispatcher reported that the suspect was wearing a hood. At the court's hearing, they acknowledged that this was incorrect. The Meslin Affidavit states that tellers at the Bank reported that the robber was about 5'7", with a small build and wore a green canvas coat with a grey hoodie and a black mask. The Meslin Affidavit futher states that the stop of Mr. Lussier's vehicle was based upon the operator being "similar in description to initial information provided by bank employees." (Doc. 37-2 at 9.) In actuality, the stop was based upon a more limited description of the robber's clothing.

to the court that would indicate that the seizure of Mr. Lussier's clothing was pursuant to a customary booking procedure.

**Conclusions of Law and Analysis**

Pursuant to Fed. R. Crim. P. 12(b)(3) and 41, Mr. Lussier moves to suppress: (1) all evidence obtained as a result of the roadside stop of his vehicle; (2) all evidence obtained as a result of the search of his vehicle; and (3) the items of clothing seized from his person upon his arrest. He contends that the state police violated his Fourth Amendment rights to be free from unreasonable searches and seizures because they stopped his vehicle without sufficient suspicion, searched his vehicle in reliance on a deficient search warrant, and failed to secure a warrant before seizing his clothing. The Government opposes suppression, arguing that law enforcement complied with the Fourth Amendment in arresting Mr. Lussier and collecting evidence against him.

**A.    The Vehicle Stop.**

Mr. Lussier first argues that the initial stop of his vehicle on Route 105 violated his Fourth Amendment rights because it was not supported by a reasonable and articulable suspicion that he was involved in criminal activity.

The Fourth Amendment prohibits unreasonable searches and seizures by the Government, *United States v. Arvizu*, 534 U.S. 266, 273 (2002), and "stopping an automobile and detaining its occupants constitute a 'seizure' within the meaning of the Fourth Amendment," *Berkemer v. McCarty*, 468 U.S. 420, 436-37 (1984) (internal quotation marks and alterations omitted). In this case, the initial stop of Mr. Lussier's vehicle was justified under the Fourth Amendment for two reasons. First, the stop was a permissible "*Terry* stop" under *Terry v. Ohio*, 392 U.S. 1 (1968) because Trooper Bruzzi had a reasonable and articulable suspicion that Mr. Lussier was involved in the bank robbery. Second, even assuming that Trooper Bruzzi lacked the individualized suspicion necessary to justify a *Terry* stop, the decision to stop Mr. Lussier was reasonable because of the need for immediate police action to prevent a potentially dangerous criminal from avoiding capture. On both points, the Government bears the burden of proving that the

8

motor vehicle stop did not violate the Fourth Amendment. *See United States v. Perea*, 986 F.2d 633, 644-45 (2d Cir. 1993).

Under *Terry*, the Fourth Amendment permits police to briefly stop and further investigate someone if they have "reasonable suspicion to believe that criminal activity 'may be afoot[.]'" *Arvizu*, 534 U.S. at 273 (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)). This authority includes the right to stop and briefly detain a motor vehicle and its occupants. *See United States v. Lucky*, 569 F.3d 101, 106 (2d Cir. 2009). In deciding whether a stop is reasonable under the *Terry* standard, "a reviewing court must determine, first, 'whether the officer's action was justified at its inception, and [second,] whether it was reasonably related in scope to the circumstances which justified the interference in the first place.'" *United States v. Bayless*, 201 F.3d 116, 132 (2d Cir. 2000) (quoting *Terry*, 392 U.S. at 20).

The Second Circuit "has characterized the quantum of suspicion necessary under the first prong of *Terry* as 'reasonable suspicion, based on specific and articulable facts, of unlawful conduct.'" *Bayless*, 201 F.3d at 132 (quoting *United States v. Scopo*, 19 F.3d 777, 781 (2d Cir. 1994)). "Because a *Terry* stop impinges to a lesser extent on Fourth Amendment concerns than does an arrest or search, the stricter standard of probable cause does not apply." *Id.* (citing *Sokolow*, 490 U.S. at 7). And although "an officer's reliance on a mere 'hunch' is insufficient to justify a stop," the requisite likelihood of criminal activity "falls considerably short of satisfying a preponderance of the evidence standard." *Arvizu*, 534 U.S. at 274 (quoting *Terry*, 392 U.S. at 27).

Whether reasonable suspicion exists involves a purely objective inquiry, and "the subjective intentions or motives of the officer making the stop are irrelevant." *Bayless*, 201 F.3d at 333; *see also Whren v. United States*, 517 U.S. 806, 810 (1996). In deciding whether a stop is constitutional, the court "must consider the totality of the circumstances surrounding the stop," and "evaluate those circumstances through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training." *Id.* (internal quotation marks omitted).

9

Under the collective or imputed knowledge doctrine, a seizure is permissible when the seizing officer - in this case Trooper Bruzzi – "lacks the specific information to form the basis for probable cause or reasonable suspicion but sufficient information to justify the [seizure] was known by other law enforcement officials initiating or involved with the investigation." *United States v. Colon*, 250 F.3d 130, 135 (2d Cir. 2001). The "primary focus" of the doctrine is "whether the law enforcement officers initiating the [seizure], on whose instructions or information the actual [seizing] officers relied, had information that would provide reasonable suspicion" to seize and detain the suspect. *Id.* at 135-36. While law enforcement personnel who have reasonable suspicion may properly instruct other officers to act without further communicating all of the facts upon which their reasonable suspicion is based, *United States v. Hensley*, 469 U.S. 221, 232 (1985), the collective knowledge doctrine has no application when there is no communication between those with knowledge and those whose conduct is challenged on Fourth Amendment grounds. *See Wong v. Yoo*, 649 F. Supp. 2d 34, 60 n.11 (E.D.N.Y. 2009) ("While in some cases . . . facts supporting probable cause may be imputed from one officer to another, *some* amount of communication between officers is necessary in order for a second officer's reliance on the first officer's knowledge to be reasonable.") (internal citation omitted). Accordingly, in this case, only Trooper Cota's observations may be imputed to Trooper Bruzzi to justify the stop. Nonetheless, courts have found a reasonable suspicion based on similar facts.

For example, in *United States v. Bourque*, 157 F. App'x 646 (4th Cir. 2005), a law enforcement officer stopped a burgundy truck with large tires and two white male occupants moments after receiving a report of an armed bank robbery committed by a lone white male who fled in a black truck with oversized tires. Although the stopped vehicle was burgundy rather than black, and contained two males rather than one, the Fourth Circuit found that "[t]hese facts provided [the officer] with a reasonable and articulable suspicion that the occupants of the truck were engaged in criminal activity," in part, because the truck was "coming from the direction of the bank" robbery. *Id.* at 649.

Similarly, *United States v. Nargi*, 732 F.2d 1102 (2d Cir. 1984), a reasonable suspicion to stop a van depended largely on the van's proximity to the suspects' last known location. In *Nargi*, law enforcement officers suspected that a plane flown by two suspects into Burlington, Vermont was carrying a large shipment of marijuana. Officers observed the plane land and taxi, but could not locate it on the ground. *Id.* at 1105. While searching for the plane, officers decided to stop a van leaving the direction of where the plane was last seen. The van had only one male occupant, but he was white and clean shaven like one of the two suspects, and the van was large enough to carry a sizeable load of marijuana. In rejecting a claim that the vehicle stop was unreasonable under the Fourth Amendment, the Second Circuit explained that, although law enforcement lacked specific details about who was driving the van, reasonable suspicion existed because the van had a large capacity, no other ground vehicles were in operation nearby, and the van "was coming from the general direction of the [area], where the plane had been headed when last seen." *Id.*

In this case, Troopers MacCallum and Cota were driving east toward the crime scene with the knowledge that a lone masked male of medium build wearing a black coat had committed a bank robbery minutes earlier, and that the suspect was last seen fleeing on Orchard Street in the direction of Route 105. Trooper Cota communicated to Trooper Bruzzi that the operator of a white sport utility vehicle was wearing a dark hooded sweatshirt. The vehicle in question had pulled over to the side of the road on the primary east-west corridor for entering and leaving Enosburg Falls where the bank robbery occurred. "[In] a 'reasonable suspicion' analysis, the fact that a person is coming from the direction of a location where a suspect was reported as being shortly prior to the stop can carry great weight." *King v. Daly*, 1992 WL 309551, at *3 (S.D.N.Y. Oct. 15, 1992). As the court in *King* explained, "[i]f a person were described merely as 'male' or merely as a 'person,' that would not necessarily rule out the possibility of reasonable suspicion; facts about location and timing might be sufficient to create reasonable suspicion." *King*, 1992 WL 309551, at *3.

11

Here, facts about location and timing, combined with other specific facts regarding the bank robber's attire, likely path of escape, gender, and solitary status, meet the "minimal level of objective justification" necessary to validate an investigatory stop. *Bayless*, 201 F.3d at 133 (internal quotation marks omitted); *see also United States v. McCargo*, 464 F.3d 192, 197 (2d Cir. 2006) (finding reasonable suspicion, in part, because officers saw suspect walking alone in high crime area near the crime scene); *United States v. Jackson*, 652 F.2d 244, 248 (2d Cir. 1981) (upholding stop of suspected bank robber, in part, because the suspect's car was coming from the direction in which the robber had fled); *United States v. Gardner*, 76 F. App'x 401, 404 (3d Cir. 2003) (finding reasonable suspicion based on fact that suspect was stopped while coming from the direction of an armed robbery shortly after it occurred). Accordingly, the court finds that Trooper Bruzzi's detention of Mr. Lussier's already stopped vehicle was supported by a reasonable and articulable suspicion of criminal activity.

The stop of Mr. Lussier's vehicle did not violate the Fourth Amendment for the further reason that it occurred in response to a serious crime and the urgent need to apprehend a suspect who, based on the objective facts available to the responding officers, posed a significant danger to the community. As the Second Circuit recently explained in *Palacios v. Burge*, 589 F.3d 556, 562 (2d Cir. 2009), the touchstone of the Fourth Amendment is always the reasonableness of law enforcement's conduct, and "the Fourth Amendment imposes no irreducible requirement of [individualized] suspicion." *Id.* (quoting *Samson v. California*, 547 U.S. 843, 855 n.4 (2006)). "Individualized suspicion is not needed, for example, in cases involving 'an exigency that justifies immediate action on the police's part,'" *Id.* (quoting *Georgia v. Randolph*, 547 U.S. 103, 117 n.6 (2006)), such as "when the police utilize an 'appropriately tailored' seizure 'set up . . . to catch a dangerous criminal who is likely to flee by way of a particular route.'" *Id.* at 563 (quoting *City of Indianapolis v. Edmond*, 531 U.S. 32, 44 (2000)). Thus, the police may respond to exigent circumstances by detaining individuals even without

12

individualized suspicion, so long as their conduct is reasonable under the circumstances. *Id.* at 563-64.

In *Palacios*, police officers knew that the perpetrators of a stabbing were among the male patrons at a nearby club, and that a failure to immediately identify the suspects would likely permit them to escape and avoid capture altogether. The officers conducted a "show-up," requiring approximately 170 men to walk, one by one, in front of two witnesses to the stabbing. *Palacios*, 589 F.3d at 559. Although the officers did not have reasonable suspicion as to any of the 170 men before detaining them for purposes of the show-up, the Second Circuit upheld the procedure as permissible under the Fourth Amendment, relying on the exigencies created by dangerous criminals who were likely to flee the area, *id.* at 563, because "the crime was serious and time was of the essence if identifications were going to be made," *id.* at 565, and because of the reasonableness of the police officers' conduct in light of such exigencies. *Id.* at 564. [3]

Similar circumstances were present in this case. The Troopers were seeking a suspect who has recently fled from what has been the most recent in a string of five bank robberies. Trooper Bruzzi knew that the perpetrator of some of the robberies had been armed, and that no arrests had been made. Under these circumstances, it was reasonable for the Troopers to act quickly, lest a potentially dangerous bank robber evade capture and further endanger the community. *See id* at 563; *see also United States v. Gordils*, 982 F.2d 64, 69 (2d Cir. 1992) (holding that "a likelihood that the suspect will escape" supports a finding of exigency).

---

[3] Mr. Lussier attempts to distinguish *Palacios* by pointing out that it relies on *Illinois v. Lidster*, 540 U.S. 419, 424 (2004), which addressed the legality of law enforcement's use of motor vehicle stops to seek more information about a recent fatality in the area. He contends that *Lidster* does not apply to cases, such as this one, in which the police conduct a motor vehicle stop to further investigate the vehicle's occupants. However, *Palacios* is a binding extension of *Lidster* and applies not only to stops made for the discrete purpose of gathering information, but also to those "aimed to identify and arrest dangerous criminals who [are] likely to flee . . . the surrounding area." *Palacios*, 589 F.3d at 563.

13

In considering the totality of the circumstances, the court must also "balance the privacy-related and law enforcement-related concerns." *Illinois v. McArthur*, 531 U.S. 326, 331 (2001). Here, law enforcement's concerns were serious, immediate, and implicated public safety. In comparison, Mr. Lussier's individual privacy interests were relatively minimal. Rather than affecting the sanctity of his home, the Troopers' conduct merely interfered with Mr. Lussier's right to resume operation of his lawfully stopped motor vehicle on a public highway. The "Fourth Amendment does not treat a motorist's car as his castle." *Illinois v. Lidster*, 540 U.S. 419, 424 (2004); *see also United States v. Navas*, 597 F.3d 492, 497-98 (2d Cir. 2010) (explaining that the "automobile exception" to the Fourth Amendment's warrant requirement is justified, in part, on the reduced expectation of privacy that citizens possess in their vehicles); *Palacios*, 589 F.3d at 565 (upholding show-up procedure, in part, because of reduced privacy interests while in public club and on public streets). Thus, as in *Palacios*, "this case does not involve heightened privacy interests that outweighed the law enforcement needs that prompted" the motor vehicle stop. *Id.*

Finally, the motor vehicle stop was properly tailored to further the relevant government interest. By searching specifically for motorists coming from the direction of the crime scene and matching the robber's physical description, Troopers MacCallum and Cota took "reasonable efforts to reconcile their law enforcement needs with the demands of personal privacy." *McArthur*, 531 U.S. at 332.

In sum, the "Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest simply to shrug his shoulders and allow a crime to occur or a criminal to escape." *Adams v. Williams*, 407 U.S. 143, 145 (1972). When the Troopers decided to stop Mr. Lussier's vehicle, they were aware of specific and articulable facts supporting a reasonable suspicion that Mr. Lussier, as operator of the white Ford Explorer, was involved in criminal activity. Additionally, they were faced with the exigency of a bank robbery and the highly time-sensitive need to apprehend a potentially dangerous criminal before he evaded capture

14

and committed additional crimes.  Given the totality of the circumstances, the Troopers'
conduct was reasonable, and therefore permissible under the Fourth Amendment.

**B.      The Scope of the Detention.**

Mr. Lussier next challenges the scope of the roadside detention, arguing that the
investigatory stop was not "reasonably related in scope to the circumstances which
justified the interference in the first place." *Bayless*, 201 F.3d at 132 (quoting *Terry*, 392
U.S. at 20).  Specifically, Mr. Lussier argues that his detention (from the roadside stop at
approximately 10:00 a.m. until the time of his formal arrest at 3:30 p.m.) extended well
beyond a detention supported by either reasonable suspicion or exigent circumstances, or
both.  In response, the Government disputes that Mr. Lussier was unreasonably detained
for Fourth Amendment purposes during the relevant time period, noting that Mr. Lussier
traveled from Route 105 to the state police barracks without handcuffs in the front seat of
Trooper Bruzzi's cruiser.

The Government's characterization of Mr. Lussier's further detention as nothing
more than a reasonable extension of a *Terry* stop is untenable.  After twice requesting to
speak with his lawyer, and after being confronted with the Troopers' suspicion that he
had committed a string of bank robberies including one that had just occurred, Mr.
Lussier was told he was being detained, and that his vehicle was going to be towed while
law enforcement applied for a search warrant.  He was then taken to the state police
barracks where he was held for approximately five hours and told he must relinquish his
clothing.  He was never told that he was free to leave, and there is no reasonable factual
basis to conclude that he was.   Under these conditions, and "[i]n contrast to the brief and
narrowly circumscribed intrusions involved in [*Terry* and its progeny], the detention of
[Mr. Lussier] was in important respects indistinguishable from a traditional arrest."
*Dunaway v. New York*, 442 U.S. 200, 212 (1979).  As such, the detention was reasonable
under the Fourth Amendment only if supported by probable cause.  *Id.* at 213; *see also*
*Gilles v. Repicky*, 511 F.3d 239, 246 (2d Cir. 2007) (finding that an "initial stop and
investigative detention had evolved into a situation indistinguishable from an arrest,"

when woman was held at roadside for approximately one hour before driving herself to the police station with a police escort).

Probable cause to arrest exists when, based on the totality of the circumstances, "the arresting officer 'has knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime.'" *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004) (quoting *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996)). As with an inquiry into reasonable suspicion, whether probable cause exists is an objective determination based on the facts available to the arresting officers at the time of the arrest. *See Finigan v. Marshall*, 574 F.3d 57, 61-62 (2d Cir. 2009).

Here, again, the collective knowledge doctrine applies. When the Troopers further detained Mr. Lussier by transporting him to and holding him at the police barracks, they did so not only based on the evidence that gave rise to the stop, but with the further knowledge that Mr. Lussier was the primary suspect in four Franklin County bank robberies and that he was coming from the direction of a fifth bank robbery wearing clothing similar to that reported to be worn by the robber. Mr. Lussier's demeanor was nervous and when confronted with an explanation as to why he may have committed the robberies, he became tearful.

Detective Sergeant Cooper, who was present at the scene, knew that Mr. Lussier's own brother-in-law, with whom he lived, had identified Mr. Lussier as the robber and that several eyewitnesses to the previous robberies had identified Mr. Lussier as the perpetrator. In plain view, Detective Sergeant Cooper saw a dark colored jacket concealing other clothing in Mr. Lussier's vehicle. Although neither party adduced evidence regarding when, how and by whom the decision to detain Mr. Lussier was made, it was clear that, collectively, the Troopers at the scene of the roadside stop possessed knowledge of facts and circumstances that would warrant a person of reasonable caution to conclude that Mr. Lussier had just committed the January 29, 2010 bank robbery. *See, e.g., United States v. Harris*, 403 U.S. 573, 582 (1971) (indicating

16

that a suspect's reputation for committing similar crimes can be used to establish probable cause); *Daniel v. Compass*, 212 F. App'x 262, 266 (5th Cir, 2006) (finding arrestee's status as a suspect in a prior crime with a similar *modus operandi* supported finding of probable cause); *Coleman v. United States*, 420 F.2d 616, 621 (D.C. Cir. 1969) (travel by arrestee on a logical escape route from scene of crime was an element in establishing probable cause). Thus, even though the initial stop of Mr. Lussier's vehicle evolved well beyond a brief investigatory detention, Mr. Lussier's Fourth Amendment rights were not violated because he was functionally under arrest and his arrest was supported by probable cause.

## C.     The Search of the White Ford Explorer.

Mr. Lussier also moves to suppress the evidence obtained as a result of searching his vehicle. He challenges the warrant issued to search the vehicle on two grounds. First, he contends that the issuing judge was misled because the supporting affidavit was based only on Mr. Lussier's clothing matching that of the suspect, and thus recklessly or intentionally omitted other relevant factual information such as the fact that Mr. lussier has been previously questioned and that a consensual search of his house had yielded no apparent evidence. Second, he argues that the warrant was not supported by probable cause.

In *United States v. Leon*, 468 U.S. 897, 922 (1984), the Supreme Court held that the Fourth Amendment does not require the exclusion of evidence obtained in reasonable reliance on a judicially issued search warrant, even if the warrant lacks probable cause or is otherwise technically deficient. The Court explained that the "marginal or nonexistent benefits produced by suppressing evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant cannot justify the substantial costs of exclusion." *Id.* In addition, the Court concluded that the existence of a warrant issued by a detached and neutral judicial officer is generally enough to establish that the officers acted reasonably in conducting a search that is directed by the warrant. *Id.* (citing *United States v. Ross*, 456 U.S. 798, 823 n.32 (1982)). Accordingly, evidence seized pursuant to

17

a subsequently invalidated warrant will be suppressed only when the defendant demonstrates that the officers "have no reasonable grounds for believing that the warrant was properly issued." *Id.* at 923. This standard may be met under four circumstances:

> "(1) where the issuing [judge] has been knowingly misled; (2) where the issuing [judge] wholly abandoned his or her judicial role; (3) where the application is so lacking in indicia of probable cause as to render reliance upon it unreasonable; and (4) where the warrant is so facially deficient [such as by failing to particularize the place to be searched or the things to be seized] that reliance upon it is unreasonable."

*United States v. Falso*, 544 F.3d 110, 125 (2d Cir. 2008) (quoting *United States v. Moore*, 968 F.2d 216, 222 (2d Cir. 1992) (alterations in quotation)); *see also Leon*, 468 U.S. at 922-23. Here, Mr. Lussier's arguments implicate the first and third of these grounds, as he contends that the supporting affidavit contained misleading information, and that the warrant application did not demonstrate probable cause.

In *Franks v. Delaware*, 438 U.S. 154, 155-156 (1978), the court ruled that although a presumption of validity attaches to a law enforcement affidavit, a defendant is entitled to challenge its veracity in a hearing if "he or she makes a 'substantial preliminary showing' that a deliberate falsehood or statement made with reckless disregard for the truth was included in the warrant affidavit and the statement was necessary to the judge's finding of probable cause." *Falso*, 544 F.3d at 125 (quoting *Franks*, 438 U.S. at 155). The requisite preliminary showing is a high bar. As the *Franks* Court explained:

> [T]he challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained. Allegations of negligence or innocent mistake are insufficient.

*Franks*, 438 U.S. at 171.

18

In this case, Mr. Lussier claims that Detective Sergeant Meslin's supporting affidavit was intentionally or recklessly misleading because it "rel[ied] upon the mere fact that Defendant Lussier's clothing appeared similar to that of the suspected bank robber[.]" (Doc. 30-1 at 8.) However, in addition to averments about Mr. Lussier's clothing—which included Detective Sergeant Meslin's observations about what he observed on the Bank's security video—the affidavit also included much of the evidence law enforcement had previously gathered regarding Mr. Lussier's potential involvement in the four other bank robberies, as well as facts placing Mr. Lussier in the vicinity of all five bank robberies. Given this additional factual support, it cannot be said that the warrant application relied upon a mere description of Mr. Lussier's clothing, together with insufficient evidence that he was involved in the other robberies. The court thus finds that Mr. Lussier has not satisfied his threshold burden of establishing that the affidavit was recklessly or intentionally misleading.

Second, the affidavit was not "so lacking in indicia of probable cause as to render reliance upon it unreasonable." As an initial matter, "[t]his is a very difficult threshold to meet, as evidenced by the many decisions of [the Second Circuit] rejecting objections to the [*Leon*] good-faith exception on this basis." *Falso*, 544 F.3d at 128 n.24 (citing *United States v. Jasorka*, 153 F.3d 58, 60-61 (2d Cir. 1998); *United States v. Cancelmo*, 64 F.3d 804, 807-08 (2d Cir. 1995); *Moore*, 968 F.2d at 222-23; *United States v. Fama*, 758 F.2d 834, 837-38 (2d Cir. 1985)). Indeed, even where reasonable minds could differ regarding the existence of probale cause, reliance upon the warrant remains reasonable, and the resulting evidence will not be suppressed.[4] *See Leon*, 468 U.S. at 926.

Here, the supporting affidavit set forth ample information for reasonable officers to conclude that it established probable cause. As explained above, the affidavit contained detailed facts implicating Mr. Lussier in the first four robberies, as well as evidence that connected him to the fifth and final robbery, including the fact that Mr.

---

[4] A reviewing court must also pay "great deference" to the issuing judge's probable cause determination. *See Illinois v. Gates*, 462 U.S. 213, 232 (1983).

Lussier was stopped near the robbery shortly after it occurred, that he wore clothing matching that shown on the Bank's security camera videotape, and that the modus operandi used in the Bank's robbery was similar to that used in several of the other bank robberies, including one in which Mr. Lussier has been identified by four bank employees as the perpetrator.

Because the supporting affidavit was neither recklessly or intentionally misleading, nor lacking in indicia of probable cause, reliance upon the warrant was reasonable and evidence obtained from Mr. Lussier's vehicle will not be suppressed.

**D.      The Seizure of Mr. Lussier's Clothing.**

Finally, Mr. Lussier moves to suppress his personal clothing items that the Troopers seized without first obtaining a warrant. This claim fails because the clothing items, including Mr. Lussier's boots, were properly seized during a search incident to Mr. Lussier's arrest.

Searches incident to a lawful arrest are a well-established exception to the Fourth Amendment's warrant requirement. *See Arizona v. Gant*, 129 S. Ct. 1710, 1716 (2009). Under this exception, police officers may conduct a warrantless search of an arrestee's person and the area from within which he might gain possession of a weapon or destructible evidence. *Id.* (citing *Chimel v. California*, 395 U.S. 752, 763 (1969)). The limitations of the exception are thus defined by its dual "purposes of protecting arresting officers and safeguarding any evidence of the offense of arrest that an arrestee might conceal or destroy." *Id.* For purposes of a motion to suppress, the Government bears the burden of proving by a preponderance of the evidence that Mr. Lussier's clothing was taken as part of a search incident to arrest, and therefore did not require a warrant. *See United States v. Arboleda*, 633 F.2d 985, 993 (2d Cir. 1980).

Notably, Mr. Lussier does not claim that his boots and clothing are not evidence of the crime for which he was arrested; rather, he merely argues that a warrant was required. However, "it is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction."

20

*Chimel*, 395 U.S. at 763. Since Mr. Lussier was detained shortly after the bank robbery, the clothing he was wearing when arrested was probative of whether he had robbed the Bank earlier that day. Left in control of his clothing items, Mr. Lussier could have altered their evidentiary value by destroying them, concealing them, or trading them for those of another inmate upon his incarceration. Accordingly, "the police were entitled to take, examine, and preserve" Mr. Lussier's clothing "for use as evidence, just as they are normally permitted to seize evidence of a crime when it is lawfully encountered." *United States v. Edwards*, 415 U.S. 800, 806 (1974); *see also id.* at 803-04 ("Nor is there any doubt that clothing or other belongings may be seized upon arrival of the accused at the place of detention and later subjected to laboratory analysis or that the test results are admissible at trial"); *United States v. Caruso*, 358 F.2d 184, 185-86 (2d Cir. 1966) (finding that bank robbery suspect's clothing was properly taken incident to arrest); *United States v. Maslanka*, 501 F.2d 208, 214 (5th Cir. 1974) (finding that warrantless seizure of suspect's clothing was "properly incident to the arrest").

Moreover, the incident to arrest exception remains applicable notwithstanding the passage of time between Mr. Lussier's initial detention, and the time his clothing was seized. "It is . . . plain that searches and seizures that could be made on the spot at the time of arrest may legally be conducted later when the accused arrives at the place of detention." *Edwards*, 415 U.S. at 803. In *Caruso*, for example, a bank robbery suspect's clothing was taken "incident to arrest" six hours after his arrest. There, the Second Circuit rejected a Fourth Amendment challenge because the suspect's clothing "were constantly in sight, were taken on the person of the suspect at the time of arrest and were continually in custody." *Caruso*, 358 F.2d at 185. The court added that the defendant's argument would mean that "the seizure of his clothing could have been made constitutionally only if, immediately on his arrest, he had been stripped to the buff on the public highway. Even though [the day of the arrest] may have been a very pleasant spring day, we are of the opinion that the argument is somewhat extreme." *Id.* at 185-86. The only difference here is that Mr. Lussier was arrested on a freezing cold day in

21

January, and it was therefore both constitutionally permissible and prudent for the Troopers to wait until Mr. Lussier was indoors with a change of clothes before taking his clothing. *See also Edwards*, 415 U.S. at 805 (waiting overnight for replacement clothing before seizing the suspect's clothes "was no more than taking from respondent the effects in his immediate possession that constituted evidence of crime. This was and is a normal incident of custodial arrest[.]").

Having found that Mr. Lussier's arrest was lawful, the court concludes that the warrantless seizure of his clothing was also lawful as a seizure of evidence incident to his arrest.

### Conclusion

For the reasons stated above, Defendant Chad Lussier's motion to suppress (Doc. 30) is hereby DENIED.

SO ORDERED.

Dated at Burlington, in the District of Vermont, this 28th day of October, 2010.

Christina Reiss
United States District Court Judge